There are three arguments in the briefs, today the focus will be on the second argument that Curtis just left off on, but I can take questions on all three arguments. The second argument is whether they conceded error that the trial court failed to ask the prospective jurors whether they both understood and accepted the Supreme Court Rule 431B principles, and in Ms. Berg's closely balanced case, she asked that this court reverse and remand for a new trial for both of her cases. Here Ms. Berg was charged with two separate misdemeanor offenses. One was resisting a peace officer in Case No. 14-CM-1012, and two, it was obstructing a peace officer in Case No. 14-CM-1013. Ms. Berg had a joint jury trial with her husband, Curtis Berg, and in the state's brief, pages 16-17, they concede that the trial court erred during its admonishments to the jury. Thus, while there is clear error, Ms. Berg, and as Ms. Berg argues, the error was preserved, and so she asked this court to review it under the first prong of plain error, because as we will be addressing today, Ms. Berg's case is boiled down to a credibility contest between the state's witnesses and Ms. Berg and Curtis. Although Ms. Berg relied on our Supreme Court's decision in SEBI heavily in her briefs, the state doesn't directly address SEBI, but she does address SEBI at length in the cases that are applicable that came after SEBI in her opening briefs from pages 33-39. She maintains that our Supreme Court's decision in SEBI is applicable to her case, because in SEBI, the court concluded that the evidence was closely balanced for the defendant who was charged with felony resisting a peace officer, and here she has resisting a peace officer and obstructing a peace officer. As the Supreme Court explained, that a jury that does not understand or accept the zero principles, specifically the principles that the defendant is presumed innocent or that the state bears the burden of proof beyond a reasonable doubt, may weigh the credibility contest in the state's favor or render a guilty verdict on insufficient proof, which could tip the scales against the defendant in a closed case, and that's what happened here. Here, regarding the elements of intent, so for the first one, knowingly resisting a peace officer, and for the second, knowingly obstructing a peace officer, the evidence is closely balanced. Specifically, to get the full picture, this Court cannot ignore the fact that Ms. Berg, on April 12th and 13th of 2014, was pregnant. She has a history of high-risk pregnancies. She was 11 weeks pregnant at the time, and there's no question that she was pregnant that day, and that is a big factor here. Regarding the element of her knowingly resisting for the first... Why is that an important factor? Well, getting to why that was important, for the knowingly resisting element, she said that she was screaming in pain, that she was cradling her stomach, that she had been kicked in the stomach. She provided testimony about that, and that's... The fact that she was pregnant is important because the officers are saying that she pulled away, that she fell to the ground, but her testimony is that she was just protecting her unborn child. So the knowingly resisting is a factor here, and because she's pregnant, the evidence in this case is closely balanced in the fact that she's saying that she was just protecting her child while she was being kicked in the stomach, thrown at the wall. The officers are saying that she's actually pulling away or falling to the ground, but that's just a credibility contest between the officers' version of events versus Ms. Berg's version of events. Officer Gooch said that he was trying to grab her arm, but then he was unable to, so he grabbed her hair. From her point of view, he might have been grabbing and grabbed her breast, might have been grabbing and grabbed her hair. So it's just two different versions of the events, which shows that this is a credibility contest between Ms. Berg and the officers. But didn't Ms. Berg go initially, law enforcement arrives, and then she runs back into the room? Yes, Your Honor, and she explains that. She explains that initially, so Ms. Berg isn't the one that called 911. Her friend, Danielle Frizzi, she called 911. So she wasn't expecting anyone to be in her home, let alone law enforcement officers who were kind of creeping around in her house, right, when they grabbed her. So Officer Wray even testifies that, yeah, initially she was surprised when, or she seemed surprised when the officers, you know, tried to grab her and tell her to come out. So that's when she ran. The first time she runs is when she says she was surprised to see, you know, strangers in her home. They grabbed her, she ran back. Ultimately, she says that she realized these were officers, but that initial point when they make contact, she didn't know, and she reasonably shouldn't have known because she didn't know that Frizzi was going to call 911. She didn't call 911. And that's for that second case. So the first case is the knowingly resisting. The second case is the knowingly obstructing. And for obstructing, there's two parts that the state charges her on. It's not following orders to leave the home, and as I just explained, when they initially told her to come out, she didn't know they were officers. Or at least Wray says that she was surprised. She says that she was surprised she didn't know that they were officers. Ultimately, she does know, but now, once again, there's another conflict between the officer's testimony and her testimony. She says that the officers told her to go get Curtis, that they were pointing a gun at her down the hallway, and she said she was pregnant, that she wouldn't come to them unless they, you know, lowered their weapons or whatnot. The officers are saying that she didn't follow their orders, she didn't come out, and that she was blocking the door for Curtis. But depending on, because there's no extrinsic corroborating evidence regarding whether she followed orders or whether the officers were, you know, pointing their guns down at her, she's saying that the officers told her to go get Curtis, which is why she was there. The officers were pointing their gun at her, and she, you know, was trying to, she was pregnant, so she was trying to protect her child. So like in Sebi, both parties presented plausible versions of the events, and they're coming from their point of view. So Ms. Berg's point of view versus Officer Gooch's point of view for the pulling the hair or grabbing the breasts, and Officers Ray and Marconi's point of view as to whether she followed their orders to come out of the home or whether she was protecting her husband in front of that door. Because both versions of events aren't implausible. They're not incredible. They're actually, they're actually credible. They're coming from, you know, her point of view, what she felt, what she was doing, protecting her child or realizing that there were officers later on versus the officers' version of events where they're saying that she pulled away and fell to the ground. She's saying that she was pushed, you know, pushed into the wall and then later pushed to the ground where they're trying to handcuff her versus her, you know, following orders initially or protecting her husband. So it's just two different versions of the event, and there's no physical evidence that can corroborate this. It's just, you know, what she said versus what the officers said. What actually does show up in the record is that she is taken to the hospital after these events. So after her interaction with Madison County Sheriff's officers on April 13th in the morning of 2014, she is taken to the hospital. She is later released from the hospital and arrested at that time. So we know that something happened here. We know that something happened that led her to go to the hospital, which makes her version of events not incredible. They're not implausible that she, you know, was pushed into the wall or that she was grabbed by the hair. So that actually corroborates her part of the testimony. That's correct, Your Honor. And if the Court does not have any other questions, all right, then Ms. Berg asks that this Court reverse the remand for a neutral in both of her cases for resisting and for obstructing. All right. Thank you. May it please the Court? Yes. Jessica Buck again for the State. To address Brittany, the defendant's contentions with regard to the Zaire error, what the Court is required to do is take a common-sense analysis of all the evidence in context. And when they say all the evidence, it means all the evidence presented at trial, not necessarily just the specific evidence of the scuffle in the hallway. Looking at all the evidence, starting with the officer's evidence of how they entered the house, especially Freese's evidence with what happened when she arrived and that Brittany called her, Freese was friends with both of them. And Brittany called her because she was upset because the defendant called Freese because she was upset because Curtis was angry and throwing things around and she spoke about the discharge of the firearm and everything. Freese testified that she had had a beer at the bar and then she went out there. When the defendant testified with regard to Freese, she said that she just called to talk to Freese, that nothing was happening in the house, it wasn't a big deal. Freese was lying and making it up and Freese was intoxicated. All of that contradicts the, if you want to talk about the 9-1-1 tapes, it contradicts the way Freese sounded on the 9-1-1 tapes. If you listen to both of them between Freese and dispatch, she did not sound inebriated at all. All that goes into the credibility of the defendant's testimony. Further, she testified that the defendant got home in about 5 minutes, I apologize, that Curtis got home in the morning and about 5 minutes later passed out cold in the bedroom. That contradicts what Freese testified to, that when he got there between 4 and 4.30 he was drunk and they started fighting again. That's completely different than the defense testimony that he got home and he passed out right away. Then you move on to the officer's testimony that when she said he passed out and she couldn't wake him up, I believe it was Marconi, when they entered the house and she ran back in the bedroom, he could hear Curtis say, basically yell, what the F did you do? And he felt like it was at Brittany. That's completely contradictory and doesn't make, using common sense, it doesn't make sense. If he is passed out cold, then how could he be awake and screaming at her? If he is passed out cold, then why would Freese testify that he came home and started arguing with her again? And he was only awake for the 5 minutes it took for him to come in the door and then pass out. All of those don't lend itself to them being closely balanced, their testimony and credibility being closely balanced. The ambulance that was called was called per procedure. It was no indication of how badly Brittany claimed she was hurt. Also, with regard to the pregnancy, using a common sense analysis, the fact that Brittany was pregnant and she was aware that she was high-risk pregnancy, if officers come in your home, even if you're surprised when they enter your home, you would not turn around and basically barricade yourself in a bedroom at the end of the hall and refuse to come out when the officers say, we want to check on you, come out. She would have utmost concern for her child and want to comply instead of escalate the situation. Common sense analysis of the situation. I guess the argument is put forth well. She didn't realize they were law enforcement. She's surprised when she runs in. It takes her a few seconds to figure out that it's the police and then she comes out. Common sense. Common sense would make sense. Common sense. She has people come into her house and she's startled and she pulls away and runs to the safety of the bedroom. Don't disagree with that being common sense. That part, once she realized they were officers, she should have then exited the room to protect her child. The fact that she stayed in the room while Curtis was yelling at her, blaming her for the officers being there, and didn't come out. I believe one of the officers testified that it was more than 10 times that they said, exit the room, we're police, come out of the room, and she didn't come out during any of that. I believe in the briefs the officers were in uniform. They clearly could see that they were officers, correct? Yes. I believe they testified that the kitchen was dark when they came in the house and she was coming into the dark kitchen. So, plausibly, she would be surprised because she wouldn't be able to see their uniforms. But at the point that they were in there for a while and yelling at her to come out and announce themselves as police, that's where a pregnant woman who's concerned about the safety of her child would be like, okay, I will comply with what you say, instead of staying in the bedroom behind the closed door. The state believes that as far as the Zaire violation, we can see that it happened, but we do not believe that when you take the totality of the evidence and look at the evidence as a whole and using a common sense analysis, we don't believe that it was a credibility, basically, balance. The state's testimony by Marconi, Ray, Gooch, Freese, who was a close friend of the Berg's yet testified contrary to both of them, all makes sense. If a jury were to look at it, they would find it credible versus the defendant's testimony that is far-fetched and improbable. We ask that you find that the evidence was not closely balanced under the plain error analysis. Thank you. Thank you, Counsel. Rebecca? Yes, Your Honor. Just a few points for this Court. The state emphasizes that this is the totality of the evidence, but as the Supreme Court and SEBI said, the Reviewing Court's inquiry involves an assessment of the evidence on the elements of the charged offenses, along with any evidence regarding the witness's credibility. So, yes, it may be the totality, but we do need to focus on the elements. And here, the intent element was closely balanced, and the jury had to find that element, had to find that charge, evidence of that charge beyond a reasonable doubt for them to convict Ms. Berg. Except here, the jury was never advised initially or given that chance to say that they understood and accepted that principle. So the SEBI Court does focus on the elements. If this Court goes back and looks at SEBI, they look at the elements of intent, and they look at the second element in that case. So the elements are important here, and that's what SEBI does. They look at the elements with the witness's credibility. Another point I want to make is that the state makes a big deal about Ms. Berg running back to Curtis, even though he's yelling at her. Here, the officers testified that when they saw Ms. Berg, she did not seem scared of Curtis. She did not seem afraid of Curtis. In fact, she ran back and stayed with Curtis because she felt that was safer than the officers pointing, from her point of view, the officers pointing their gun at her or grabbing her in the dark. So I think that says a lot about the case here where even the officers said, yeah, I mean, it didn't seem like she was scared of, you know, her husband. And another point there is, yeah, the kitchen was dark. Marconi and Ray's testimony kind of conflict, in that Marconi testified that he thinks he just grabbed her and told her, let's go. Ray says that they identified themselves. But that testimony there is conflicting as to that initial grab in the dark in the kitchen. Another point I want to make is about Frizzy. So Frizzy is a 911 caller, but Ms. Berg also testified that Frizzy sideswiped Curtis' car and that an argument ensued between Curtis and Frizzy, and that when Curtis came back, Frizzy was like, I'm no longer going to stay in this house. So, and another point, a notable point I want to make is that Frizzy is the one that testifies. After she hears her own 911 recording, that she's like, oh, I don't sound drunk, or I don't sound intoxicated in that 911 tape. But it's Frizzy who testifies as to how she sounded like. My final point that I want to make is about the ambulance. So Marconi does say that it's protocol to call an ambulance, but Ms. Berg testifies that I asked for an ambulance twice. I asked for an ambulance. I was screaming in pain. I had been hit in the stomach, and I had been pushed on the ground while they were trying to handcuff me behind my back. So the ambulance might have been protocol, but Ms. Berg also did request it twice, at least according to her testimony. And unless the Court has any other questions, Ms. Berg asks that this Court reverse the remand for a new trial for both of her misdemeanor cases. Thank you, Your Honor. Okay. Thank you, counsel, for your arguments. We will take some further advisement. When you're seated in due course, we will take a brief recess, and that will be set at 11 o'clock.